**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
ROCK HILL DIVISION**

| | |
|---|---|
| Bradford & Bradford, P.A., ) | C/A NO. 0:09-CV-02981-CMC |
| ) | |
| Plaintiff, ) | |
| ) | **OPINION AND ORDER** |
| v. ) | |
| ) | |
| Attorneys Liability Protection Society, Inc., ) | |
| a Risk Retention Group, ) | |
| ) | |
| Defendant. ) | |
| _____) | |

This matter is before the court on cross-motions for summary judgment. Dkt. Nos. 22 & 24. At issue is whether a professional liability policy which Defendant, Attorneys Liability Protection Society, Inc. ("ALPS"), issued to Plaintiff, Bradford & Bradford, P.A. ("Bradford"), covers claims asserted against Bradford by First Citizens Bank and Trust Company, Inc. ("Bank").

The Bank's action against Bradford ("Underlying Action") was filed on June 23, 2009, and seeks to recover money the Bank wired to foreign accounts on Bradford's instructions. Bradford issued those instructions as a result of falling victim to an email scam which involved a request from a new "client" for assistance in collection efforts and a related request that Bradford deposit a check from a delinquent customer and wire the proceeds, less a retainer, to two foreign accounts. As may be surmised from the present litigation, the check turned out to be fraudulent, as did the intentions of the putative client and delinquent customer.

Bradford takes the position that the Underlying Action falls within the scope of coverage of its professional liability policy because the wire transfer was requested based on a belief that the instruction came from a new client and was related to the collection work for which the firm believed it had been hired. ALPS takes the position that the policy does not cover the Underlying

Action for a variety of reasons including that (1) the absence of a real "client" precluded creation of an attorney-client relationship, (2) the requested wire transfer does not fall within the scope of the policy's definition of "professional services," and (3) various exclusions defeat coverage.

For the reasons set forth below, the court grants ALP's motion for summary judgment and denies Bradford's motion.

## STANDARD

Summary judgment is appropriate "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). It is well established that summary judgment should be granted "only when it is clear that there is no dispute concerning either the facts of the controversy or the inferences to be drawn from those facts." *Pulliam Inv. Co. v. Cameo Properties*, 810 F.2d 1282, 1286 (4th Cir. 1987).

The party moving for summary judgment has the burden of showing the absence of a genuine issue of material fact, and the court must view the evidence before it and the inferences to be drawn therefrom in the light most favorable to the nonmoving party. *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962). When the nonmoving party has the ultimate burden of proof on an issue, the moving party must identify the parts of the record that demonstrate the nonmoving party lacks sufficient evidence. The nonmoving party must then go beyond the pleadings and designate "specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e); *see also Celotex Corp. v. Catrett*, 477 U.S. 317 (1986).

A party "cannot create a genuine issue of material fact through mere speculation or the building of one inference upon another." *Beale v. Hardy*, 769 F.2d 213, 214 (4th Cir. 1985).

Therefore, "[m]ere unsupported speculation . . . is not enough to defeat a summary judgment motion." *Ennis v. National Ass'n of Bus. & Educ. Radio, Inc.*, 53 F.3d 55, 62 (4th Cir. 1995).

## FACTS

The facts are essentially undisputed. Plaintiff Bradford is a law firm located in York County, South Carolina. Dkt. No. 1-1. Charles S. Bradford is the founder and now sole partner of the firm.[1] Dkt. No. 25-1 ¶ 4. Defendant ALPS is a risk retention group that issued a Lawyers Professional Liability Policy (the "Policy") to Plaintiff and its attorneys. Dkt. No 1-1 at 2.

On May 26, 2009, Bradford received an email from a person who identified himself as Patrick Chan ("Chan") and asked Bradford to represent Chan's company, Carmel Manufacturing Pte Ltd. of Hong Kong ("Carmel"), in the collection of debts owed by Carmel's overseas customers. Dkt. No. 25-1. Bradford emailed Chan an engagement letter describing the proposed scope of representation and the law firm's requirement of a $2,500 retainer. Chan signed and returned the engagement letter by email on June 1, 2009. Dkt. No. 25 at 2.

Also on June 1, 2009, Chan informed Bradford that there was now "an urgent payment request by a customer [Carmel] had informed of using [Bradford's] services to collect [Carmel's] monies owed and the customer [was] willing to make a partial payment through [Bradford's] firm." Dkt. No. 25-3 at 8. Bradford instructed Chan that the customer, Bruderer Machinery, Inc. ("Bruderer"), should make its check payable to the firm. Chan then instructed Bradford to deposit the payment when it was received and to deduct Bradford's $2,500 retainer from the payment. Dkt. No. 25-3 at 8. Bradford agreed to this course. *Id.* at 9.

---

[1] As to all events at issue here, Charles Bradford acted as the representative of the law firm. The court, therefore, generally refers to the entity ("Bradford") in this order. Where necessary to refer to Mr. Bradford directly, the court refers to Charles Bradford.

3

On June 3, 2009, Bradford received what appeared to be a Citibank, N.A. check from Bruderer for $362,400.25 and made payable to Bradford. An invoice from Carmel to Bruderer was also enclosed. Dkt. No. 1-1 ¶11. Bradford deposited the check into the firm's IOLTA trust account at First Citizens Bank. *Id.* ¶13.

Subsequently, Chan contacted Bradford asking the firm to wire portions of the $362,400.25 to accounts at a bank in Japan. *Id.* ¶14. Charles Bradford instructed a member of his staff to check with the Bank as to the status of the funds. The staff member contacted the Bank and was informed that "the funds had posted and were available." Dkt. No. 25 at 3. Bradford complied with Chan's requests and initiated two wire transfers from the firm's trust account.

On June 8, 2009, the Bank informed Bradford that the $362,400.25 check was counterfeit and had been rejected by Citibank. Dkt. No. 1-1 ¶16. By this time, the funds from the wire transfers had been removed from the Japanese bank accounts. Dkt. No. 25-5 at 97, 101. The funds were never recovered. *Id.*

In order to cover the wire transfers, the Bank debited the funds that were then in Bradford's trust account, approximately $42,000. This resulted in a negative balance of $320,400.25. Dkt. No. 22-2 ¶¶ 15,16. The Bank then filed suit against Bradford in state court, seeking damages in the amount of the counterfeit check plus costs and attorney fees.[2] *Id.* ¶18. The Bank asserts causes of action for collection and breach of presentment warranty. *Id.* ¶¶19-29. The Bank relies, in part, upon a 2002 "Wire Transfer Agreement" through which Bradford agreed to "hold harmless and indemnify the Bank for any costs and expenses including attorneys fees incurred to prosecute or

---

[2] Although the bank has apparently already recovered approximately $42,000 from Bradford's trust account, its complaint seeks recovery in the full amount of the wire transfers.

4

defend any claim related to a requested or completed wire transfer." Dkt. No. 22-2 at 2. Pursuant to the same agreement, Bradford agreed that "the Bank is not liable for any losses or damages that result from [Bradford's] failure to provide complete and accurate information, or any action, inaction, or circumstances beyond the Bank's control." *Id.* at 3. Although the Bank expressly relies on the Wire Transfer Agreement for recovery of costs and expenses, its two causes of action are dependent primarily on warranty theories. *See* Dkt. No. 22-2 ¶¶ 20 & 23 (relying on warranty "that official check was property payable" which arose from Bradford's "presentation and indorsement" of the check); *id.* ¶ 25 (relying on warranty that check was "legal tender and solvent when [Bradford] deposited it").[3]

Bradford promptly informed ALPS of the circumstances that led to the Bank's suit. The first notice was a letter which Bradford sent to ALPS upon learning that the check was counterfeit. Dkt. No. 22-3. After the suit was filed, Bradford promptly provided ALPS with a copy of the complaint and asked ALPS to provide a defense. By letter dated June 26, 2009, ALPS denied coverage and declined Bradford's request that ALPS provide a defense. Dkt. No. 22-3. This litigation followed.

## DISCUSSION

Bradford has asserted two causes of action against ALPS. Bradford seeks a declaratory judgment that ALPS owes Bradford a duty of defense and indemnification because the Underlying Action is covered under the Policy and asserts breach of contract against ALPS for breaching the Policy by refusing to defend Bradford in the Underlying Action. Dkt. No. 1-1. Bradford has moved

---

[3] While it is possible that there is a contract through which Bradford agreed to indemnify the Bank for losses (not just costs and expenses) upon compliance with Bradford's wiring instructions, neither provision above nor any other document provided to the court includes such a promise.

for summary judgment on the declaratory judgment claim and partial summary judgment as to ALPS's liability on the breach of contract claim.

ALPS has moved for summary judgment on both claims. It contends that Bradford has failed to show that the Underlying Action falls within the scope of the Policy and that ALPS has shown that exclusions in the Policy apply. As a result, ALPS argues that it owes neither a duty to defend nor a duty to indemnify Bradford in the Underlying Action.

### A. SCOPE OF COVERAGE

The Policy states that ALPS has a duty to defend Bradford in any claim that falls within the coverage of the Policy and a duty to indemnify Bradford for damages arising from claims within the scope of coverage of the Policy. Bradford argues that ALPS owes it both a duty to defend and a duty to indemnify in the Underlying Action.

#### 1. Duty to Defend

As a general rule, the duty of a liability insurance company to defend a claim brought against its insured is determined by the allegations of the complaint. *See e.g.*, *City of Hartsville v. S.C. Mun. Ins. & Risk Financing Fund*, 677 S.E.2d 574, 578 (S.C. 2009). If the underlying complaint creates a possibility of coverage under an insurance policy, the insurer is obligated to defend. *Id.* (citing *Gordon-Gallup Realtors, Inc. v. Cincinnati Ins. Co.*, 265 S.E.2d 38 (S.C. 1980)). Facts outside the complaint may also give rise to a duty to defend if known to the insurer.[4] Therefore, the duty to

---

[4] As explained in *City of Hartsville v. South Carolina Municipal Insurance and Risk Financing Fund*:
> Although the cases addressing an insurer's duty to defend generally limit this duty to whether the allegations in a complaint are sufficient to bring the claims within the coverage of an insurance policy, an insurer's duty to defend is not strictly controlled by the allegations in the complaint. Instead, the duty to defend may also be determined by facts outside of the complaint that are known by the insurer.

6

defend is broader than the duty to indemnify because the duty to defend is triggered by the mere possibility of coverage. *See* 22 Eric Mills Holmes, *Holmes' Appleman on Insurance* § 136.1 (2d ed. 2003). The burden of showing the possibility of coverage is on the insured. *See* 44A Am. Jur. 2d *Insurance* § 1962.

An insurer's duty to defend is separate and distinct from its obligation to pay a judgment rendered against an insured. *Hartsville*, 677 S.E.2d at 578 (citing *Sloan Constr. Co. v. Cent. Nat'l Ins. Co. of Omaha*, 236 S.E.2d 818 (S.C. 1977)). However, these duties are interrelated.

The Bank's complaint seeks to recover money damages from Bradford under two legal theories. First, the Bank asserts a claim for "Collection" of the $362,400.25 the Bank advanced to Bradford on credit based on Bradford's "presentation and indorsement" of the fraudulent check. Dkt. No. 22-2 ¶¶19-23. Second, the Bank asserts a claim for Bradford's alleged breach of warranty that the check was "legal tender and solvent" when deposited.[5] *Id.* at ¶¶14-29.

In reviewing the present motions, the court considers both the allegations in the Bank's complaint and the summary letter which Bradford provided to ALPS before the Bank's suit was filed. Dkt. Nos. 22-2 & 22-3.

### 2. Policy Provisions

The general scope of coverage is set out in § 1.1 of the Policy. This section provides in

---

*Hartsville*, 677 S.E.2d at 578-79 (quoting *USAA Prop. & Cas. Co. v. Clegg*, 661 S.E.2d 791, 798 (S.C. 2008)); *see BP Oil Co. v. Federated Mut. Ins. Co.*, 496 S.E.2d 35, 39 (S.C. Ct. App. 1998).

[5] In its complaint, the Bank alleges that Bradford presented the check for deposit into its IOLTA trust account on June 2, 2009. Dkt. No. 22-2 ¶6. Upon receiving the check, the Bank "advanced funds on credit" to the firm's IOLTA trust account in the amount of $362,400.25, the amount of the check. *Id.* ¶¶8,22. On June 4 and 5, 2009, Plaintiff requested two wire transfers from the IOLTA trust account to Japanese Banks and prior to the Bank learning the check was counterfeit. *Id.* ¶¶9-12.

7

relevant part:

> Subject to the limit of liability, exclusions, conditions and other terms of this policy, the **Company** agrees to pay on behalf of the Insured all sums (in excess of the **deductible** amount) that the **Insured** becomes legally obligated to pay as damages, arising from or in connection with A **CLAIM** FIRST MADE AGAINST THE **INSURED** AND FIRST REPORTED TO THE COMPANY DURING THE **POLICY PERIOD**, provided that . . . the **claim** arises from or is in connection with:
>
>     1.1.1    an act, error or omission in **professional services** that were or should have been rendered by the **Insured** . . ..

Dkt. No. 18-2 at 3 (emphasis in original). The term "professional services" is defined in § 2 of the policy as:

> 2.22    **Professional services** means:
>
>     2.22.1 services or activities performed for others as an attorney in an attorney-client relationship on behalf of one or more clients;

Dkt. No. 22-1 at 7 (emphasis in original).

### 3.    Professional Services

#### *a.*    *Attorney-Client Relationship*

ALPS argues that the Bank's claims do not fall under the professional liability policy because they did not arise out of any "professional services" provided by Bradford. Dkt. No. 22 at 7. This argument rests, in part, on an argument that no attorney-client relationship ever arose because Carmel's sole purpose was to defraud Bradford and not to hire the firm. This poses a difficult issue because, when communicating with Carmel, Bradford did not know it was being targeted in a scam. Bradford argues that, from its perspective, through the email communications with Chan and pursuant to a signed engagement letter the parties had entered into an attorney-client relationship. Dkt. No. 27 at 5.

As defined in the Policy, for actions by Bradford to qualify as "professional services" they

8

must be (1) services or activities (2) performed for others as an attorney (3) in an attorney-client relationship (4) on behalf of one or more clients. Therefore, without an attorney-client relationship, any actions taken by Bradford under the direction of Carmel cannot be considered "professional services."

Under South Carolina law the attorney-client relationship is created when the attorney undertakes to perform a particular legal service for the client. 1 S.C. Jur. Attorney and Client § 18. "A person attains the status of a 'client' when that person seeks legal advice by communicating in confidence with an attorney for the purpose of obtaining such advice. The legal advice or assistance must be sought from the attorney with a view to employing him professionally, whether or not actual employment results." *In re Broome*, 589 S.E.2d 188, 195-96 (S.C. 2003) (citing *Marshall v. Marshall*, 320 S.E.2d 44, 47 (S.C. Ct. App. 1984) (internal citation omitted)). The attorney-client relationship cannot be assumed because it is created by the consent of the parties. 1 S.C. Jur. Attorney and Client § 18. "[T]he attorney [cannot] create the relationship without the client's consent." *Id.*

In this case, Bradford has failed to proffer evidence that Carmel ever sought assistance from Bradford "with a view to employing [it] professionally."[6] Instead, the only reasonable inference from the proffered evidence is that Chan contacted Bradford and purported to seek representation for Carmel solely for the purpose of perpetuating a fraud. Bradford concedes that Carmel's intentions in hiring the firm were dishonest and fraudulent. In the letter sent to ALPS

---

[6] As stated above, it is the insured's burden to show that a claim falls under the scope of coverage of an insurance policy. Therefore, because of the definition of "professional services" contained in the Policy in this case, it is Bradford's burden to show the existence of a valid attorney-client relationship.

9

accompanying a copy of the Bank's complaint against Bradford, Bradford concedes that the firm was "providing services for a client who turned out to be less than honest."[7] Dkt. No. 22-4 at 3. The only evidence Bradford puts forth that Carmel intended to enter an attorney-client relationship is the signed engagement letter, which alone is not enough. There is no evidence that Carmel ever asked Bradford to perform any services other than depositing a counterfeit check and wiring funds in furtherance of a fraudulent scheme. South Carolina law requires that both parties to an attorney-client relationship intend to provide and receive legal advice. Without that mutual intention there cannot be a valid attorney-client relationship.[8]

The court finds that there was no attorney-client relationship formed between Bradford and Carmel, and therefore, Carmel was never Bradford's client. Without an attorney-client relationship, none of the actions Bradford took at Carmel's request can be considered "professional services" under the policy because they were not "services or activities performed for others as an attorney

---

[7] Bradford also provided the court with deposition evidence in which Charles Bradford concedes that the firm was "defrauded by a person [it] thought was [its] client" and that the firm was "duped." Dkt. No. 25-5 at 7.

[8] ALPS raises the possibility that Carmel and Chan were fictitious. Bradford has provided no evidence to the contrary and has conceded that it is possible that "the individual who contacted [Bradford] might have used a fake name, or otherwise not have been who he claimed to be." Dkt. No. 28 at 2-3. Whether or not Carmel and Chan were fictitious, Bradford has failed to proffer evidence that Carmel's intention in contacting Bradford was anything other than to perpetrate a fraud even if Bradford thought it was obtaining a new client.

In its memoranda Bradford makes much of the fact that whether or not Chan or Carmel were fictitious, an attorney-client relationship can be formed through brief interactions that do not occur in-person (citing to five cases and a law review article). Dkt. No. 28 at 3-4. It is not the brevity of the communications between Bradford and Carmel or the fact that the communication was by email that concerns this court. What is of paramount importance under South Carolina law in determining the existence of an attorney-client relationship is whether the putative client was seeking to obtain legal advice. Bradford has not provided evidence to the court that Carmel was seeking to obtain legal advice.

10

in an attorney-client relationship." If Carmel was never a client, then nothing Bradford did at Carmel's request was "on behalf of one or more clients" as required by the "professional services" definition. Therefore the Bank's claims in the Underlying Action do not "arise from . . . an act, error or omission in professional services," which precludes Bradford from the possibility of coverage by ALPS under the Policy. While ambiguities that arise in an insurance policy must be construed in favor of the insured, the court does not find an ambiguity in this policy. *See e.g.*, *Leggett v. Smith*, 386 S.E.2d 699, 709 (S.C. 2009). The definition of "professional services" in the Policy is precise in requiring the existence of an attorney-client relationship and actions performed on behalf of a client, neither of which existed in this case.

### b. *Professional Services Generally*

The court need not decide whether the actions Bradford took would have qualified as professional services had an attorney-client relationship existed. ALPS provided the court with two cases from other jurisdictions which rejected as a matter of law the notion that facilitating a check-passing scheme on behalf of someone posing as a client constituted professional services by the lawyers involved. *See Fidelity Bank v. Stapleton*, No. 07A-11482-2 (Ga. Super. Ct. filed Jan. 14, 2009) (holding that opening an account, accepting a check, depositing a check and then wiring funds to Asia do not require application of legal knowledge unique to the practice of law and do not constitute legal services); *Fleet Nat'l Bank v. Wolsky*, No. 04-CV-5075 at 6 (Mass. Super. Ct. filed Dec. 6, 2006) (holding that "the receipt, indorsement, and deposit of a check, and the distribution of funds" could not be considered legal services because, relying on state law, legal services must be understood to refer to services that "require a lawyer's specialized knowledge, labor, or skill"). Those cases differ from this case in that the policies there did not define professional or legal

11

services as those performed in an attorney-client relationship on behalf of a client. Therefore, while this court reaches the same result, this case is decided on different grounds.[9]

On the point of whether the services provided by Bradford to Carmel were "professional services," Bradford relies heavily on a Fourth Circuit case, which in defining professional services, holds that "the controlling circumstance is whether the attorney was in fact engaged for the purpose of obtaining his legal services." *Continental Cas. Co. v. Burton*, 795 F.2d 1187, 1191 n.2 (4th Cir. 1986) (quoting *Ellenstein v. Herman Body Co.*, 129 A.2d 268, 270 (N.J. 1957). As stated above, the court finds that Bradford cannot meet this "controlling circumstance" because Bradford was never engaged by Carmel for the purposes of obtaining its legal services. Carmel's intent was to perpetrate a fraud and perpetuating a fraud is all Carmel was engaged in.[10]

## B. EXCLUSIONS

The court need not reach the issue of whether any of the exclusions under the Policy apply to the Underlying Action. Bradford has not met its threshold burden of showing that the Underlying Action falls under the scope of the Policy's coverage, therefore the exclusions need not be

---

[9] ALPS also cites to *Chong v. Medmarc Cas. Ins. Co.*, which holds that a check-passing scheme is not covered by the attorney's liability policy because the claim is for restitution which is explicitly excluded from the policy in that case. 2009 WL 4855737 (M.D. Fl. Dec. 10, 2009). The court in that case notes that it was "not persuaded by Defendant's arguments regarding a lack of attorney-client privilege." *Id.* at *4 n.3. Because that opinion does not specify what Defendant's arguments were in regards to an attorney-client relationship, this court cannot rely on *Chong* for this point.

[10] While this result may seem harsh, the court has considered that a professional liability policy is intended to protect the insured as to claims based on acts or omissions by the insured acting as an attorney for a client, not from scams perpetrated by persons pretending to be clients to defraud the insured.

12

considered.[11]

## CONCLUSION

For the above stated reasons, Bradford's motion for summary judgment is denied. ALPS's motion for summary judgment is granted.

**IT IS SO ORDERED.**

                                                s/ Cameron McGowan Currie
                                                CAMERON MCGOWAN CURRIE
                                                UNITED STATES DISTRICT JUDGE

Columbia, South Carolina
October 20, 2010

---

[11] In determining whether the exclusions apply, the court would have construed them most strongly against the insurer, who bears the burden of establishing the exclusions' applicability. *Owners Ins. Co. v. Clayton*, 614 S.E.2d 611, 614 (S.C. 2005).